ELLIS, Judge.
This is a suit for compensation wherein the plaintiff has alleged as a result of an accident and injury on June 5, 1948 while employed by the Bankhead Drilling Company that he is entitled to $20 per week not to exceed 400 weeks for total and permanent disability, less a credit of $20 per week paid as workmen’s compensation for 30 weeks.
The defendant’s answer was a general denial.
The case was first heard on July 1, 1949 and again on March 3 and 7, 1950, but it was not until July 26, 1951 that the matter was submitted on briefs by agreement of counsel, and on October 24, 1951 there was judgment with written reasons rejecting the demands of the plaintiff at his cost. It is from this judgment that plaintiff has appealed.
While it was denied that plaintiff suffered an accident and the testimony is not too strong on this question, the district court found in view of the testimony of the medical experts that plaintiff probably suffered a lumbar muscle strain, and also found, in view of the testimony of a fellow worker as to the accident, that the plaintiff had sustained the burden of proving an accident within the meaning of the compensation act. In this finding we agree.
The question to be decided, which is one of fact, is as to the period of disability. The plaintiff contended that he was totally and permanently disabled as the result of the accident. The district court found that he was disabled not more than six months and had been paid in full together with all medical bills and, hence, dismissed his suit.
Immediately after the accident the plaintiff was taken to the Baton Rouge General Hospital where he was seen by Dr. Tanner but we do not have the benefit of any testimony by this doctor. It is further shown that this man was seen by Dr. Sheppard, Dr. Dowell, Dr. Bannerman and a Dr. Ward of Victoria, Texas, and Dr. Godfrey. We have in the record the testimony of Drs. Dowell, Bannerman and Godfrey.
Dr. Bannerman testified that he had examined the plaintiff on the 15th of June, 1949 and that he also reviewed X-rays previously made of the plaintiff on two occasions and they were negative for any injury that could be associated with the accident of June 5th, 1948, however, there did appear to be a slight forward displacement of the third lumbar vertebra as compared with the second lumbar vertebra which he thought represented a congenital variation and was not the result of the injury which he sustained. His diagnosis was: “No definite orthopedic diagnosis can 'be made of this man. It appears he sustained a lumbar strain from which he has recovered with slight residual disability. It is my belief this man is able to return to the type of work he was doing as an oil field worker. The only positive finding which can be found on examination is slight tenderness to the left of the lumbar region which is compatible with muscular weakness. The use of postural exercises in which he has been instructed should result in this clearing. I am unable to explain why he has pain localized in this area on the basis of the examination performed. T do not feel' that the pain is sufficient to prevent his carrying out his work. That is a summary of my findings and conclusions on Mr. Prukop as of June, 1949.”
Dr. Bannerman, on cross examination, frankly stated that the plaintiff probably sustained a sprain or strain at the time of his injury but it was his positive opinion that the man was able to return to work and that this sprain was disabling anywhere “from two weeks to four, to five, to six months.”
Dr. Dowell examined the plaintiff the first time on August 6, 1948 at which time he found tenderness of the lumbosacral joint and the muscles to the left of the third lumbar vertebra. Following this examina *244 tion the plaintiff was admitted to the hospital and placed in traction for a period of one week, and prior to discharge was fitted with a spinal brace. It was Dr. Dowell’s opinion at this time that the plaintiff was improved although symptomatically there had been very .little improvement as plaintiff still complained of pain to the left of the third lumbar vertebra. The doctor stated that this area was on two occasions infiltrated w-ith one per cent novocain, a local anesthesia, but that there was no apparent or acknowledged relief of pain on either of these occasions. Dr. Dowell, on October 26, 1948, again saw’ the plaintiff, and it was his opinion at that time that he was capable of returning to work. Plaintiff was re-examined by Dr. Dowell and report made on February 19, 1949, and the doctor was of the same opinion at that time that plaintiff was capable of returning to full duties. He did not see the plaintiff again until he re-examined him and made a report on June 16, 1949, and he was of the opinion that there had been no change in plaintiff’s condition since his last report of February 19, 1949. This doctor stated that he felt that the plaintiff did incur a lumbar muscle strain at the time of his injury and that he had máde a satisfactory recovery from this injury. Dr. Dowell was also of the opinion that the irregularity shown by the X-ray in" the third lumbar vertebra was .of no significance in this particular case, for he did not believe it was caused by the accident sustained in June 1948. It was shown that a report from the Ochsner Clinic stated that this irregularity was post traumatic in origin, however, both Dr. Bannerman and Dr. Dowell were of the opinion that it had no connection with the accident of June 5, 1948 and the report, as shown by testimony referring to it, did not state whether the irregularity in the plaintiff’s 'back was due to the injury of June 1948 or a prior injury.
Dr. Godfrey examined the plaintiff on the 3rd of February, 1949 and again on the 28th of June 1949 and had his back X-rayed by Dr. Malen and received a report February 8, 1949 in which it was stated that there was a probable dislocation between the second and third lumbar vertebrae and possibly a left sacro-iliac relaxation. Dr. Godfrey disregarded the possible diagnosis of sacro-iliac relaxation as the plaintiff had no complaints in that region, but felt that possibly the plaintiff had a slight dislocation or slipping between his second and third lumbar vertebrae. It was his opinion that the plaintiff was not exaggerating and was sincere in his complaint of pain and discomfort, and with a dislocation as shown in the X-ray he could definitely conceivably have such discomfort, and he thought it would disable the plaintiff from doing hard, manual labor. He was particularly concerned with the thought of the plaintiff doing any amount of derrick work. Dr. Godfrey, when asked if a severe strain on June 5, 1948 would have produced the complaints that the plaintiff made to him answered: “It might have.” This doctor’s findings on the two dates given were much the same with the exception that the first time he found the area slightly swollen, whereas on the second occasion it no longer seemed swollen. With this variation the examination and complaints were the same.
On cross examination Dr. Godfrey stated that it was his opinion that the plaintiff’s back would slowly get less sensitive and •slowly get stronger to the point where he could do quite active and fairly heavy work but doubted that the plaintiff should ever do any high structural steel or high climbing work, and it was his opinion that possibly the plaintiff could do the active and heavy work on the ground on the date he gave his testimony which was January 30, 1950. This doctor was asked the following question and gave the following answer:
“Q. Are you able to state whether or not the displacement which was noted in Doctor Malen’s X-ray report occurred as the result of trauma or whether it is a congenital deformity? A. No. I would not be able to state whether it is traumatic or congenital. It might have been something he had had since birth or childhood, it might have been a follow up of an old accident at one time or another, but whether it was a new condition that he received on June 5, 1948, or whether it was an old condition he had had, silent and unknown *245 for years, the complaints from, it did originate from the time of the accident.
* * * * *
“Q. Is a dislocation this high in the hack ordinarily sustained from bending or straining of the back? A. I think it would depend entirely on the position and the degree of straining that took place. Of course, ordinarily dislocations are caused by more severe things, such as falling or auto accidents or direct blows. Like I say, I don’t even know that Mr. Prukop received this injury at the time of the accident in June, 1948. It might have been a previous thing that he either didn’t know about or was tolerating well. He might have been in an auto accident before and received it. I can’t tell. All I know is the complaints started from that date, according to his story.
“Q. In your diagnosis, Doctor, you had to place a great deal of reliance on the subjective complaints of Mr. Prukop? Is that correct. A. ' Yes, sir.”
Thus we find two doctors who are positive in their findings and diagnoses, testifying that the plaintiff was able to return to full duty within six months and who were positive that the injury shown by the X-rays was not attributable to the accident of June, 1948. But on the other-hand, we have the testimony of Doctor Godfrey who was of the opinion that the plaintiff’s pains could be attributable to the accident of June, 1948 but who refused to state positively that the condition of his back as shown by the X-rays was due to the injury of June, 1948. He stated that it could have been congenital or it could have been caused by an-older injury.
In addition to the testimony of these doctors, the defendant caused to be taken some moving pictures of the plaintiff at work for the Bankhead Drilling Company on September 19th and 20th, 1949. On March 3, 1950 when the case was, again taken up for trial the plaintiff was called by the defendant on cross-examination and positively testified that the condition of his back was still the same but that he was then painting for the Bankhead Drilling Company, his employer at the time of his injury-in June, 1948. He testified that he only used a spray gun and sometimes raked leaves up in the yard but that he had not done any' oil field work or anything like the work he had done before. He stated that he could not do heavy work. He was asked the following question and gave the following answer: “Q. Then it is your testimony that since the date of your alleged accident on June 5, 1948, that you have never done any work of a more strenuous nature than spray painting? A. That is right, a quart spray gun.”
Following the plaintiff on the stand was a witness who was employed by the National Corporation Service, a licensed and bonded detective agency, who testified that on September 19th and 20th, 1949 he observed the plaintiff working at the oil field or well site, which was in the Louisiana State University section, and that he photographed the plaintiff during that time with five rolls of moving picture film. These photographs were taken between the hours of 10:00 a. m. and 3:15 p. m. in the afternoon, however, it is shown that these five films only show 12j4 minutes activity of the plaintiff during that time. For this 12^4 minutes, however, this man used a large Stillson wrench, worked on pipes overhead and on the ground, and was shown in a sitting position with his feet against the pipe pulling on the Stillson wrench in order to tighten it or loosen it. He was also shown carrying pipe, all of which were some of the’duties of a “roughneck.”
Dr. Bannerman and Dr. Dowell-observed the showing of these films and' stated that they only confirmed their opinion that the plaintiff was able .to return to full duties. The -plaintiff did not take the stand after the showing of these pictures, nor did he offer the testimony of any fellow worker that he had only done painting since his injury.
This Court had the benefit of observing these pictures, also.
In view of the facts as above given, we are of the opinion that the judgment of the District Court is correct and should be affirmed.